IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No. 10-cv-00956-RPM

E. DEAN JAGERS,
TOM JACOBS,
STANLEY KRIEGER,
MATT ROSENGRANTS,
SAND ARROYO RANCH, INC.,
GELNN R. AUSMUS, and
RUSSELL L. AUSMUS,

       Plaintiffs,
v.

FEDERAL CROP INSURANCE CORPORATION,

       Defendant.

___

## MEMORANDUM OPINION AND ORDER
___

       The Plaintiffs in this civil action planted corn on non-irrigated farm land in Baca County, Colorado, in 2008. They applied for revenue protection for the possible loss of yield from their planting under the terms of a form of insurance policy issued by the Federal Crop Insurance Corporation, as authorized under the Federal Crop Insurance Act, 7 U.S.C. § 1508 (FCIA). In subsection (3)(iii) of that Act such insurance shall not cover losses due to "the failure of the producer to follow good farming practices...."

       Baca County experienced a severe drought in 2008. The spring rains did not fall and the dry conditions adversely affected the yields from non-irrigated acres. The Plaintiffs other than Glen and Russell Ausmus planted corn on acreage that did not grow a crop in previous years

because that land had been in the Conservation Reserve Program (CRP). They were denied indemnity payments for the failure of those acres to produce corn because their breaking out of those acres and planting non-irrigated corn on them was deemed not a good farming practice by the Risk Management Agency (RMA).

That agency denied indemnity payments to Glen and Russell Ausmus for the loss of yield on their non-irrigated acreages because they did not put fertilizer in with their planting as required by good farming practices according to the RMA.

The Plaintiffs seek judicial review of these denials as permitted by 7 U.S.C. § 1508(a)(3)(B)(iii) and the Administrative Procedure Act, 5 U.S.C. §§ 701-706. Under either statutory authority, relief in this court can be granted only if those administrative determinations are found to be arbitrary or capricious. The finding must be based on the contents of the administrative record.[1]

The Plaintiffs applied for Group Risk Income Protection (GRIP) insurance in March, 2008. GRIP policies are issued by insurance companies approved by the FCIC, referred to as "approved insurance providers" (AIPs). 7 U.S.C. § 1502(b)(2); 7 C.F.R. § 400.701. The FCIC reinsures the AIPs and is thus the indemnitor for the covered loss.

The purpose of GRIP insurance is to protect producers from a widespread loss of revenue from a particular commodity due to drought, flood or other natural disaster.

For any FCIA policy, the contract of insurance includes "an accepted application, Basic Provisions, applicable Commodity Provisions, other applicable options and endorsements,

---

[1] Pages of documents in the Administrative Record have been Bate-stamped with the designation "RMA," followed by a number. References to the administrative record follow that format.

the Special Provisions, related materials, and the applicable regulations published in 7 CFR chapter IV." 7 C.F.R. § 400.701. A policy called The GRP Common Policy is published at 7 C.F.R. § 407.9. The GRIP Basic Provisions have not been adopted as regulations. The published GRP Basic Provisions and GRIP Basic Provisions have some common definitions and provisions.

Under a GRIP policy, the insured is indemnified if the county average per-acre revenue for the insured crop falls below the insured's "trigger revenue." A GRIP policyholder elects a percentage coverage level. (GRIP Basic Provisions, RMA 000567). The policyholder's trigger revenue is determined by multiplying the expected county revenue for the insured crop by the insured's chosen coverage level. (*Id*. RMA 000566). The expected county revenue is set forth in actuarial documents included in the policy and is determined by "multiplying the expected county yield by the expected price." (*Id*. at 000565). The expected county yield is determined using historical county average yields published by the National Agricultural Statistics Service ("NASS"), an agency of the USDA. (*Id*.)

The RMA determines the actual county revenue for the insured crop in the calendar year following the insured crop year. The actual county revenue is determined by multiplying the harvest price by the final county yield for the insured crop, as determined by the NASS. (*Id*. RMA 000564). If the county revenue for the insured crop falls below the insured's trigger revenue, an indemnity is due. (*Id*. RMA 000566).

Some GRIP crop insurance policies specify whether the insured crop must be produced by an irrigated or non-irrigated practice. Such policies are known as "specified practice" policies, and their indemnity provisions are based on NASS production data for the insured crop

produced by the specified practice. For some counties, the NASS does not publish acreage and production data separately for irrigated and non-irrigated practices. In those counties, the RMA offers GRIP insurance policies that do no not limit the production method. They are known as "no practice specified" policies. For those policies, the indemnity provisions are based on NASS data for total county production of the insured crop produced by both irrigated and non-irrigated practices – i.e, a "blended yield."

The Plaintiffs' GRIP policies are no practice specified policies.

Section 3(c)(2) of the GRIP Basic Provisions provides:

We [the insurer] will not insure any acreage:

\* \* \*

(2) Where you [the insured] have failed to follow good farming practices for the insured crop; or

(i) Planted to a type, class or variety not generally recognized for the area; or

(ii) Where the conditions under which the crop is planted are not generally recognized for the area (For example, where agricultural experts determine that planting a non-irrigated corn crop after a failed small grain crop on the same acreage in the same crop year is not appropriate for the area); . . . .

(GRIP Basic Provisions, Insured and Insurable Acreage, RMA 000566-67); *see also* 7 U.S.C. § 1508(3)(A)(iii) (FCIA crop insurance does not on cover losses attributable to the failure of the producer to follow good farming practices.).

The term "good farming practices" is defined, in relevant part, as follows:

The production methods utilized to produce the insured crop and allow it to make normal progress toward maturity, which are: (1) For conventional or sustainable farming practices, those generally recognized by agricultural experts for the area; . . . . We [insurers] may, or you may request us to, contact FCIC to determine whether or not production methods will be considered to be "good farming practices."

(GRIP Basic Provisions, Definitions, RMA 000565).

The term "generally recognized" is defined as:

When agricultural experts or the organic agricultural industry, as applicable, are aware of the production methods or practice and there is no genuine dispute regarding whether the production methods or practice allows the crop to make normal progress toward maturity.

(*Id.*)

The term "agricultural experts" is defined as:

Persons who are employed by the Cooperative State Research, Education and Extension Service or the agricultural departments of universities, or other persons approved by the FCIC, whose research or occupation is related to the specific crop or practice for which such expertise is sought.

(*Id*. RMA 000564).

Coverage may be excluded for acreage where the insured fails to follow good farming practices, even when a policy is designated as a "no practice specified" policy. (RMA Bulletin No. MGR-08-006, RMA 002972-74).

On May 5, 2008, the RMA received an e-mail from an AIP agent that states in part:

It has come to my attention that some farmers in Baca County Colorado think they have a way to milk crop insurance out of a fortune using the GRIP program for corn in their county. ... The rumor is that they are breaking out pasture land and intending to insure it on the first year it is cultivated.

(RMA 004210).

On May 6, 2008, the RMA responded to the AIP agent:

Thanks for the information. We're looking in to this and other counties that may have similar GRP issues and are planning to make some changes for the 2009 crop year. Although the GRIP policy does not have the new breaking provisions of APH/CRC/RA provisions. It does contain a requirement that good farming practices be followed. I'm attaching a memo that was recently issued reminding insurance

> Companies of this requirement [i.e.,Bulletin No: MGR-08-006]. Thanks again for the information. I am going to pass this along to others in the agency.

(RMA 004210).

On May 16, 2008, in response to the allegation of program abuse, the RMA discussed sending an RMA representative to Baca County "to ground truth the rumors. Capture what is going on in the area, visit with FSA, Extension but also include the AIP so they can take control." (RMA 004163). In addition to investigating the alleged program abuse, the RMA was considering ways to remedy the alleged abuse in the future.

> As you mentioned today, it is a shame that GFP [Good Farming Practice] is the only way to manage this and that appears to be true this year. However we can push to either remove the NI [non-irrigated] practice or make other policy changes to minimize these "opportunities."

(RMA 004164).

In considering alternatives for addressing the alleged program abuse, RMA representatives discussed good farming practices:

> [P]lease don't pressure us to support a decision of failure to follow a good farming practice on producers across the board this year. We have a nonirrigated practice for corn for APH purposes in this county. We have appropriate yields established for this practice in this county under the production plans. A blanket good farming practice determination is no way to handle this issue. There are a lot of acres being planted under the nonirrigated practice for which producers have every intention of growing a crop.

(RMA 004162).

On May 19, 2008, the RMA discussed the use of good farming practice determinations:

> I agree that GFP decisions must be made on an individual basis. However, we must assess the conditions at planting and the growing season to determine the necessary management practices so that those individual decisions can be made.

(RMA 004162).

On June 19, 2008, the RMA mailed letters to AIPs requesting 2008 crop year reviews and growing season inspections. (RMA 004213-17; RMA 004218-25). The June 19, 2008 letter states in part:

> [The RMA] has alerted the CRCO [Central Regional Compliance Office] of program abuse concerns in Baca County, Colorado. It is alleged large tracts of land are being sold and broken out of pasture/rangeland, planted to dry land corn, and insured under the corn GRP/GRIP plan of insurance. In addition, allegations that the producers are not following good farming practices have been reported.
>
> * * *
>
> Based on our analysis, to date, the number of calls regarding specific program abuse concerns, we have determined and confirmed there is sufficient evidence to warrant a monitoring program of the 2008 crop year GRP/GRIP corn policies in Baca County, Colorado.

(RMA 004213-14; RMA 004218).

The June 19, 2008 letter advised the AIPs of the requirements for conducting the 2008 crop year reviews and growing season inspections and advised the AIPs that the RMA will not provide reinsurance for GRIP policies that do not meet approved policies and procedures. (RMA 004215; RMA 004220).

The RMA employees were aware of an investigation by the Office of Inspector General (OIG) of the Department of Agriculture begun in May, 2008, reviewing the effects of blended yields for 1,517 counties throughout 41 states for GRIP county crop programs covering corn, cotton, grain sorghum, soybeans and wheat. The OIG Audit Report was issued under date of March 4, 2009. That report included the following statements specific to corn producers in Baca County:

>In Baca County there were 39 GRIP corn insureds covering 48,190 acres with liabilities over $52.7 million and premiums over $7.2 million. At the time we initiated our review, we judgmentally selected 8 of the largest GRIP insureds because these policies covered over 70 percent of the total insured acreage, liability, and premium in the county. For the eight insureds selected for review, we examined their insurance history, cropping history, farming practices, and possible reasons for increasing the number of acres planted to corn, and purchase GRIP coverage. In addition, we performed field inspections to verify that the eight insureds actually planted corn, assess the condition of the corn crop, and determine the farming practices being carried out by these insureds
>
>\*\*\*
>
>We judgmentally selected 8 of the 10 largest insureds in Baca County, covered under the GRIP plan of insurance in crop year 2008 for review to determine their insurance history, cropping history, farming practices, and what may have motivated producers to dramatically increase the number of acres planted to corn, and purchase of GRIP coverage. We also performed field visits to verify that corn was actually planted, to assess the general condition of the corn crop, and to determine whether producers followed good farming practices. Based on our field visits, we concluded that because of extreme drought conditions, there would be minimal production from non-irrigated corn acres; production from irrigated corn acres had also been negatively impacted. We were unable to make a determination as to whether good farming practices were actually being carried out due to the extreme drought conditions in the county. We also interviewed seven of the eight insureds [FN omitted] selected for review, as well as their crop insurance agents.
>
>\*\*\*
>
>We found that the eight GRIP insured in our sample dramatically increased their planted corn acreages for the 2008 crop year. Three of the insureds had no history of planting corn in the county for at least the prior 6 crop years (2002-2007), and three of the insureds had only planted a combined 506 acres to corn. However, in crop year 2008, these six insureds planted a combined 32,525 acres of corn. The remaining two insureds had a history of planting corn, but their corn acres for 2008 increased over 200 percent from their prior 6-year average. In total, the eight insureds represented 36,931 acres of 48,190 acres planted to corn, or over 75 percent of the GRIP corn acres in 2008, and over 32 percent of the 111,927 corn acres insured in the county under all plans of insurance, including GRIP. We noted that only 2,488 of the 36,931 acres planted by the insureds were irrigated. We also noted that four insureds in our sample obtained part of their planted acreage by sodbusting about 4,200 acres of native rangeland to plant GRIP corn.

The OIG recommended discontinuance of the use of "no practice specified" policies for future years among, other recommendations.

As the OIG investigation progressed, the people at RMA realized the extent of the losses that would be claimed as the result of the no practices specified and the mixed blend of yields. The exchange of email communications in the record reveals the adoption of a strategy to use the failure to follow good farming practices exclusion from coverage to reduce the expected losses. In April, 2009, the RMA instructed the AIPs to issue denial letters on that basis. They were given a form letter to use.

ARMtech, the insurer of the Glen and Russell Ausmus farms, declined. On June 17, 2009, ARMtech told RMA that the insurer had difficulty finding anyone to opine about whether the Ausmus producers had failed to follow good farming practices and sent information it had collected about those farms.

RMA then sent denial letters to those two producers informing them that they would not be paid for their loss of any crop on the non-irrigated acres due to their failure to follow good farming practices. The RMA's denial letters of August 7, 2009, asserted that the failure to follow good farming practices was the failure to apply the minimum amount of fertilizer necessary to allow the crop to make normal progress to maturity.

The Ausmuses normally applied fertilizer as a "side-dressing" to a growing corn crop. These were not breakout lands. Due to the lack of rainfall, the seed did not produce any plants. The Ausmuses did not apply any fertilizer in 2008 because the plants did not emerge from the ground.

In its investigation, ARMTech consulted with Kevin Larson, a Colorado State University research scientist at the Plainsman Research Center, in Walsh, Colorado. In a letter dated May 26, 2009, Larson opined:

> Upon review of the dryland corn farming practices used by Glen Ausmus, I find they were appropriate for the dry conditions for the 2008 season. Fertility was not the yield-limiting factor for these dryland corn fields, the lack of precipitation caused the low yields. Sidedressing nitrogen on dryland corn is an accepted fertilization practice for dryland corn in our area. Sidedressing allows for fertilizer management according to the conditions. Under the extremely dry conditions that we experienced in 2008, I do not believe that fertilization would have increased the yields. In my opinion, sidedressing nitrogen on for [sic] the dry 2008 season might have resulted in lower corn yields because of soil moisture loss and root pruning of the corn crop. Again, the low corn yields were caused by lack of precipitation, not lack of fertilizer.

(RMA 002614).

The RMA gave no weight to this opinion. The RMA cited three publications to support its conclusion.

One was an article entitled *Best Management Practices for Colorado Corn*, published by Colorado State University (RMA 001489-95). That publication includes this paragraph:

> An application schedule that applies a small amount of N [nitrogen] early in the season (preplant or starter) followed by later, in-season applications of higher amounts of N is ideal. This schedule takes care of the small, but important early season N needs and maximizes uptake by applying N during the rapid growth and N requirement period.

(RMA 001495).

The RMA also relied on an excerpt from the *Corn Production Handbook*, a 2007 publication of the Kansas State University Agricultural Experiment Station and Cooperative Extension Service. (RMA 002794-98). That publication discusses best practices for corn production under various conditions in Kansas.

The RMA also relied on an excerpt from a July 2002 publication of the Colorado State University Cooperative Extension, entitled *Dryland Corn Newsletter*. (RMA 002799-800). That publication includes the following statement:

>Some N may be band-applied in combination with starter fertilizers, but the rate should be less than 20 lbs N/acres (based on 2 inches beside and 2 inches below the seed application in order to avoid burning the crop. Apply only 10 lbs N/acre maximum if using pop-up placed directly with the seed.

The cited publications do not support for the RMA's determination that the Ausmuses failed to follow good farming practices. These references are not relevant to the reality that the dry weather prevented the seed from growing. Reliance on the exclusion from coverage for the failure to follow good farming practices requires a showing that such failure had a causal connection with the loss of the crop.

These denials were arbitrary and capricious decisions that must be reversed.

Whether planting corn on newly broken land is a failure to follow good farming practice is a much closer question. The Plaintiffs' suggestion that the RMA's actions were motivated by an effort to mitigate the effects of the bad policy choices of using blended yields and authorizing no practice specified policies, is not a determinative factor in this review. What is relevant is the reasonableness of the RMA's reliance on the information cited in support of the exclusion.

To support denials of coverage for the "newly broken land Plaintiffs," the RMA relied on four pieces of evidence: (1) information provided to the RMA by Bruce Bosley, a Colorado State University extension agent, in an email dated March 3, 2009 ("the Bosley email," RMA 000292-93); (2) a study conducted near Tribune, Kansas ("the Tribune Study," RMA 000288-91); (3) information published in a Kansas State University Extension Agronomy weekly e-Update dated February 20, 2009 ("the KSU e-Update," RMA 000228-36), and (4) an 1996 article entitled *Soil Fertility Considerations for Land Coming Out of CRP* ("the Nebraska article," RMA 000247-52 and RMA 001484-88). The RMA also noted that the Plaintiffs did not provide any opinions or publications to contradict those sources.

(1) The Bosley email

The Bosely email was written in response to an inquiry by RMA employee William Ferris, who sought information from the Colorado State University Extension about taking land out of CRP and planting corn. On March 3, 2009, Bosley sent an email to Ferris, summarizing Bosley's response to that inquiry. Bosley stated:

> . . . There is no drier soil than that which has been in native or CRP Sod. If you're farming dryland don't expect a crop this calendar year unless you get a huge amount of spring moisture (5" or so).
>
> With 5" or more rainfall, Proso millet may be possible If [sic] you're farming in Northeast Colorado and have experience in growing it. . . .

(RMA 000292). Bosley discussed recommended soil preparation techniques such as undercutting grass roots and disking and stated, "*Doing this now and fallowing through the remainder of the spring and summer may prepare the ground for winter wheat planting this fall.*" (*Id.*, emphasis added).

The Plaintiffs argue that the Bosley email does not meet the required form for an expert opinion, pointing out that Bulletin MGR-05-010 states that a written expert opinion should be provided on letterhead or include evidence of the expert's certification. The Plaintiffs note that the email does not indicate whether Bosley's research or occupation is related to corn and his remarks are not directed specifically to Baca County.

They argue that the Bosley email is deficient because it does not address all of the factors enumerated in Paragraph I.B.3 of Bulletin MGR-05-010. In other words, the Plaintiffs contend that an adequate expert opinion must address whether the production method used by the producer will (a) allow the insured crop to make normal progress toward maturity; (b) produce at least the yield used to determine the production guarantee or amount of insurance; (c) not reduce

-12-

or adversely affect the yield, and (d) be generally recognized for the area. The Plaintiffs characterize the Bosley email as "personal guidance via email," rather than an acceptable expert opinion.

The Plaintiffs are mistaken about the requirements of Bulletin MGR-05-010. The Bulletin states that when an AIP questions whether the producer's practice is a good farming practice, the producer may show that his practice is a good farming practice by providing an expert opinion or opinions. In that circumstance, an expert opinion provided by the producer must address the four factors enumerated in Paragraph I.B.3, and all four factors must be present for a practice to be considered a good farming practice. The Plaintiffs apparently contend that when the RMA relies on an opinion or publication as evidence that a practice is not a good farming practice, the opinion must likewise address all four factors. The argument of a reciprocal requirement for the RMA is not consistent with the purpose of the Bulletin – to guide AIPs in making a decision.

      (2)     The Tribune, Kansas study

The RMA also relied on an article entitled "*Best Management Practices for Returning CRP Land to Crop Production*," which describes a study conducted by Kansas State University during 1995 and 1996 in west-central Kansas near Tribune, Kansas. The purpose of the study was to evaluate practices for returning CRP land to crop production. The variables evaluated were residue treatment (burn, mow, or leave standing), grass control method (tillage or chemical control), and initial crop selection. The crops selected for the study were grain sorghum and winter wheat. The article's authors made several observations, including the following statement:  "[S]oil water is depleted by the CRP grasses, and a fallow period to store soil water

will be necessary prior to crop planting." (RMA000291).

The Plaintiffs argue that the Tribune, Kansas study does not support the RMA's conclusions about their farming practices because the study concerns wheat and sorghum production in Kansas and does not address the question of whether planting corn on newly broken land in Baca County, Colorado would allow the insured crop to made normal progress toward maturity.

The Defendant states that Tribune, Kansas is located approximately 100 miles from Baca County, and the article's statement about the necessity of a fallow period applies equally to practices for corn production in Baca County. It is reasonable to consider this study as applicable to Baca County corn.

    (3) the KSU e-Update

The RMA also relied on a weekly electronic publication of the Kansas State University Extension Agronomy, dated February 20, 2009, which addressed (among other topics) "Western and Central Kansas CRP conversion to cropland." (RMA 000228-36).

The KSU e-Update states, "By using conventional-till to bring the land back into production, the producer will be able to aggressively work the ground where needed to fracture clods and root masses." (RMA 000228). For producers using conventional-till, the e-Update provides the following guidance:

> Producers should plan on making several trips across the field the first year to control the existing perennial vegetation and smooth out the soil. Root masses will need to be fractured. A combination of plow, disc, and field cultivator should provide a good seedbed.

(*Id.*)

The Plaintiffs argue the KSU e-Update does not address whether a fallow period is

required when a producer utilizes conventional tilling. The Plaintiffs also assert the record is inadequate with respect to the qualifications of Brian Olson, one of the publications' authors. Four authors contributed the information in the KSU e-Update about CRP conversion to cropland – Brian Olson, Curtis Thompson, and Dorivar Ruiz-Diaz, and Alan Schlegel. Olson is identified as a crops and soils specialist, Thompson is identified as a weed management specialist; Ruiz-Diaz is identified as a nutrient management specialist, and Schlegel is identified as the Agronomist-in-Charge, Southwest Area Research-Extension Center, Tribune, [Kansas]. (RMA 000230-31).

       (4)     the Nebraska article

The RMA also relied on a 1996 article entitled "Soil Fertility Considerations for Land Coming out of CRP," issued by the Cooperative Extension, Institute of Agriculture and Natural Resources, University of Nebraska-Lincoln. ("Nebraska article," RMA 000247-52 and 001484-88). The Nebraska article addresses matters such as soil sampling, fertilizer application methods, and crop choice.

Although the Nebraska article does not address the necessity of a fallow period, the Defendant contends that it demonstrates that resolving soil fertility issues is a lengthy process and thus a fallow period is necessary before planting crops on land previously utilized for CRP or pasture. (Def.'s br. at 68).

If the question were to be decided upon the basis of a preponderance of the evidence with the burden of proof on the RMA, the Plaintiffs may prevail in their contention that these sources of information are insufficient. That is not the question. It is whether the RMA's reliance on the Bosley opinion and the publications was arbitrary or capricious. It was not. While this Court may

disagree with the decision, it must give it the deference due to an agency's determination under the standard for judicial review of agency action both under the APA and 7 U.S.C. § 1508(B)(iii).

The Plaintiffs also claim the RMA's determinations must be set aside because the agency failed to follow its own procedures for GFP determinations as set forth in the FCIC Crop Insurance Handbook, §§ 3(B) and 5(C) (RMA 003476, 003541); the RMA Loss Adjustment Manual, ¶¶ 136 and 140 (RMA 003333-35 & 003343), and the FCIC Manager's Bulletin MGR-05-010 (RMA 002963-71). The Plaintiffs contend the challenged GFP Determinations were predetermined by the RMA and the RMA deviated from its own procedures by directing AIPs to assemble information about their insureds' production methods and by pressuring AIPs to make GFP decisions. The Plaintiffs further contend the RMA improperly used the GFP exclusion as a tool to combat suspected abuse of the GRIP program, pointing out that 7 U.S.C. § 1515 and 7 C.F.R. § 400.451(a) provide remedies for addressing alleged fraud, waste and abuse of the federal crop insurance program. They assert there is no evidence showing the Plaintiffs intended to abuse the program.

Contrary to the Plaintiffs' arguments, it was not improper for the RMA to communicate with the AIPs regarding the need for growing inspections and GFP determinations, particularly where the RMA had been alerted to potential program abuse in Baca County. The RMA's procedures provide it with authority to review GFP determinations made by AIPs and make GFP determinations, if the AIP is unable to do so. (*See* FCIC Manager's Bulletin MGR-05-010.) The process by which the RMA made these determinations was not so irregular as to require that the GFP Determinations be overturned.

The remedies described in 7 U.S.C. § 1515 and 7 C.F.R. § 400.451(a) augment the provisions of the insurance policy. *See* 7 C.F.R. § 400.451(c) ("Any remedial action taken pursuant to this subpart is *in addition to any other actions specifically provided in applicable crop insurance policies, contracts, reinsurance agreements, or other applicable statutes and regulations*.") (emphasis added). The existence of statutory remedies does not preclude the denial of coverage on the basis of a policy exclusion.

As discussed above, the issue is whether the publications and expert opinion cited by the RMA provided sufficient evidentiary support for the agency's determinations that the Plaintiffs did not follow good farming practices, as defined in the GRIP basic policy provisions. With respect to the Glen and Russell Ausmus (the fertilizer Plaintiffs), the denials of coverage were based on publications that were not relevant to the reasons that the crops failed to make any progress toward maturity. With respect to newly broken land Plaintiffs (Jagers, Jacobs, Krieger, Rosengrants and Sand Arroyo Ranch) the denials of coverage were not arbitrary or capricious.

Based on the foregoing it is

ORDERED that the Defendant's denial of GRIP insurance coverage for the 2008 Baca County corn crop of Plaintiff Glen R. Ausmus under GRIP policy number 711546 is vacated, and the Defendant's denial of GRIP insurance coverage for the 2008 Baca County crop of Plaintiff Russell L. Ausmus under GRIP policy number 711545 is vacated. Defendant Federal Crop Insurance Corporation shall indemnify Plaintiff Glen R. Ausmus and Plaintiff Russell L. Ausmus for their covered losses. It is

FURTHER ORDERED that the Defendant's denials of GRIP insurance coverage are affirmed with respect to the 2008 Baca County corn crops of Plaintiff E. Dean Jagers; Plaintiff

Tom Jacobs; Plaintiff Stanley Krieger; Plaintiff Matt Rosengrants, and Plaintiff Sand Arroyo Ranch, Inc. It is

FURTHER ORDERED that costs shall be awarded to Plaintiff Glen R. Ausmus and Plaintiff Russell L. Ausmus upon the filing of a bill of costs pursuant to D.C.Colo.LCivR 54.1.

DATED:  July 6, 2012

BY THE COURT:

s/ Richard P. Matsch
_____
Richard P. Matsch, Senior District Judge